FILED

2016 Mar-10  PM 02:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| COLEMAN R. "COLE" LANKFORD, II, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 2:14-cv-00083-JEO |
| v. | ) | |
| | ) | |
| DOUBLE EAGLE SPORTS AND EVENTS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM OPINION**

In this action, plaintiff Coleman R. "Cole" Lankford, II, a former Senior Project Manager for defendant Double Eagle Sports and Events, LLC ("Double Eagle"), seeks to recover unpaid overtime compensation he claims he is owed under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* Double Eagle contends that Lankford was exempt from overtime under the FLSA's administrative and executive exemptions, and has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Doc.[1] 23). For the reasons discussed below, Double Eagle's motion is due to be denied.

---

[1] References to "Doc. __" are to the document numbers assigned by the Clerk of the Court to the pleadings, motions, and other materials in the court file, as reflected on the docket sheet in the court's Case Management/Electronic Case Files (CM/ECF) system.

## I.   SUMMARY JUDGMENT STANDARD

Double Eagle has moved for summary judgment pursuant to Rule 56.  Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion," relying on submissions "which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).  Once the moving party has met its burden, the nonmoving party must "go beyond the pleadings" and show that there is a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 324.  Both the party "asserting that a fact cannot be," and a party asserting that a fact is genuinely disputed, must support their assertions by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  FED. R. CIV. P. 56(c)(1)(A), (B).

A judge's guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Allen v.*

*Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).  "In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the nonmoving party."  *United States v. Four Parcels of Real Property in Greene and Tuscaloosa Counties in the State of Alabama*, 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc).

In its review of the evidence on a motion for summary judgment, the court views the evidence in the light most favorable to the nonmovant.  *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000).  All justifiable inferences from the evidence are to be drawn in favor of the nonmovant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  The nonmovant need not be given the benefit of every inference, but only of every reasonable inference.  *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).  "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment."  *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citations omitted).  At summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.

## II.   FACTS

Double Eagle is an event management company that provides rental equipment and materials for different types of events, including golf tournaments. Among its clients are the Professional Golf Association, the Web.com Tour, the Ladies Professional Golf Association, and the Champions Tour.  (Deposition of Coleman Lankford ("Lankford Dep.") at 40-41; Deposition of Ryan McMinn ("McMinn Dep.") at 12).[2]

In June 2007, Double Eagle hired Lankford as a Project Manager at a yearly salary of $75,000.  The following year his salary was increased to $78,500.  His title changed to Senior Project Manager in 2008 or 2009, but his job duties remained the same.  During his employment at Double Eagle, Lankford worked primarily with Double Eagle's golf clients.  On average, Lankford worked on four golf tournaments per year.  (Declaration of Coleman Lankford ("Lankford Dec.") ¶¶ 1, 8; Lankford Dep. at 51-52).[3]

Lankford's written job description included the following "Project Management" duties:

- Creates and executes project work plans and revises as appropriate to meet changing needs and requirements

---

[2] The Deposition of Coleman Lankford is located at Doc. 25-1, and the Deposition of Ryan McMinn is located at Doc. 25-3.

[3] The Declaration of Coleman Lankford is located at Doc. 29-1.

- Identifies resources needed and assigns individual responsibilities

- Manages day-to-day operational aspects of a project and scope

- Reviews deliverables prepared by team before passing to client

- Effectively applies our methodology and enforces project standards

- Prepares for engagement reviews and quality assurance procedures

- Minimizes our exposure and risk on project

- Ensures project documents are complete, current, and stored appropriately

(Doc. 25-1at 59).  His job description also included the following "Project Accounting" duties: "Tracks and reports team hours and expenses on a weekly basis" and "Manages Project budget."  (*Id.*)  Lankford, however, testified that the written job description "does not sound like the job that I was actually able to do. … Several items on [the job description] I was never given the opportunity to do. Everything I did was under supervision from upper management.  And this makes it sound like I did it."  (Lankford Dep. at 13).

When Lankford was assigned a golf tournament, a Double Eagle account executive would give him the scope of work for the project, which Lankford referred to as "Exhibit A."  Exhibit A listed the structures, equipment, and materials required for the project.  (Lankford Dec. ¶ 12; Lankford Dep. at 62-63). According to Lankford, he did not create Exhibit A and could not use his

independent judgment to make any changes to Exhibit A.[4]  (Lankford Dec. ¶¶ 3,
12).  He could, however, recommend a revision to Exhibit A if he believed a
revision was necessary.  Sometimes Double Eagle would approve a revision he
recommended, and sometimes it would not.  (Lankford Dep. at 50).

Lankford had no role in setting the budget for a project.  According to
Lankford, he was never consulted on the budget for a project and never received a
written budget for any project.  He did not analyze project profitability and was not
apprised of project revenues.  (Lankford Dec. ¶ 4).

After receiving and reviewing Exhibit A, and before traveling to the
tournament site, Lankford would contact Double Eagle's warehouses and request
the equipment and materials needed for the project, such as scaffolding, plywood,
and timbers.  He would also contact the logistics department and coordinate the
delivery of the equipment and materials to the job site.  He would try to stagger the
deliveries to correspond with the progress of the construction.  Lankford would
also "put together quotes" for any rental equipment that was needed.  He would
then submit the quotes to Double Eagle's upper management for approval.  Once
approved, Lankford would sign the rental agreements on behalf of Double Eagle.
He did not have the authority to sign the agreements absent approval from upper
management.  (Lankford Dec. ¶ 12; Lankford Dep. at 57-60, 78-79).

---

[4] According to Double Eagle, project managers had input into the creation of Exhibit A.
(McMinn Dep. at 34).

Lankford would also determine the number of workers who were needed to complete the project.  The number varied from project to project.  Most of the time Double Eagle's operations department would send employees who were already part of its existing workforce.  Lankford could request specific employees he wanted on the job, but he testified that he was never given all of the specific workers he asked for.  (Lankford Dec. ¶ 13; Lankford Dep. at 70-73).  There were also assistant project managers assigned to each project; Lankford testified that he had no role in deciding which assistant managers would be assigned to which project (Lankford Dec. ¶ 16), while Double Eagle asserts that the decision was a collective effort between the project manager and the operations manager (McMinn Dep. at 65).

Occasionally it was necessary to supplement Double Eagle's staff with temporary workers.  In those instances Double Eagle would authorize Lankford to call the local office of one of the national temporary labor firms and ask them to send over the number of temporary workers he needed.  (Lankford Dep. at 71-72).

Lankford would also locate temporary housing for the Double Eagle employees who would be working on the project.  He would solicit quotes from various housing companies and then submit the quotes to upper management for approval.  He did not have the authority to sign leases without management approval.  (Lankford Dep. at 101; Lankford Dec. ¶ 12; McMinn Dep. at 37-39).

Once Lankford arrived at the tournament site, he would make sure that the materials and equipment were properly inventoried and that everything he had asked for was there.  After he confirmed the inventory, the equipment would be disbursed and construction would begin.  (Lankford Dep. at 58).

As the Senior Project Manager on a project, Lankford was the client's "on-site contact."  (Lankford Dep. at 86).  He reported to the client's representative, the tournament director.  (*Id.* at 83).  If the client determined that a change in the plans (Exhibit A) was needed, the client would usually present the change to Lankford first.  Lankford could not implement the change on his own, but instead had to submit the change to upper management.  He could make recommendations regarding the requested change, but needed upper management approval before making the change.  (Lankford Dep. at 44-45; Lankford Dec. ¶ 6).

During the course of a project, Lankford was authorized to make job-related purchases using a company credit card.  He did not need to obtain upper management approval prior to making the purchases.  Double Eagle never denied any of the purchases he made using the company card.  (Lankford Dep. at 134-35).

During construction, Lankford supervised the other workers on site and "made sure they were doing the job they were assigned to do."  (Lankford Dep. at 90).  During the initial phase of the construction, all of the workers performed the same work (building floors for the tents); later, Lankford would divide the

8

employees based on their areas of expertise.  (*Id.* at 74-75).  Lankford was also responsible for safety on the job site and for reporting safety incidents to Double Eagle's human resources department.  (*Id.* at 81).

With respect to his own activities on the job, Lankford stated in his interrogatory answers that he "felt more like a working foreman than an actual project manager because whereas [he]did have some supervisory authority, [he] spent a considerable amount of time working alongside the hourly paid employees performing the same duties as they performed."  (Doc. 30-1 ¶ 11).  In his declaration in opposition to Double Eagle's motion for summary judgment, he similarly stated that his position was akin to a "working foreman" position and that on "most days" he worked "side by side with the hourly paid employees performing the same or similar duties as they performed."  (Lankford Dec. ¶¶ 8, 23).  However, he also provided inconsistent estimates of the percentage of time he was engaged in manual labor.   In his answers to Double Eagle's interrogatories, Lankford estimated that he spent "at least 25%" of his time on a normal job performing manual labor. (Doc. 30-1 ¶ 11).  In contrast, in his declaration he stated that he spent "75-80%" of his time performing manual labor.  (Lankford Dec. ¶ 8).

According to Lankford, he had no authority to hire or fire workers without management approval.[5]  (Lankford Dec. ¶ 22; Lankford Dep. at 185-86).  He could recommend that Double Eagle hire particular individuals, but they would have to be interviewed by the operations manager or someone in upper management. (Lankford Dec. ¶ 13).  On a "couple of" occasions Double Eagle hired individuals he recommended; on other occasions he recommended individuals who were not hired.  (Lankford Dep. at 187).  Likewise, Lankford could request approval to fire an employee, and on one occasion was given such approval.  On several other occasions his request to fire an employee was not approved.  (*Id.* at 185).

Lankford could also recommend that a particular employee be paid a certain wage, but he could not set an employee's salary or give pay raises.  He was responsible for verifying the number of hours each employee worked and for distributing payroll checks to the employees each week.  (Lankford Dec. ¶ 14).

Because golf tournaments have fixed start dates, timely completion of each project was imperative.  Towards that end, Lankford monitored the progress of each project and advised Double Eagle's upper management when projects fell behind schedule.  He would tell upper management what he needed in terms of additional workers or additional equipment to complete the job on time.  If Double

---

[5] Double Eagle's corporate representative, Ryan McMinn, testified that Lankford "could send somebody home from his job site" without management approval, but he did not know whether Lankford had ever done so.  (McMinn Dep. at 57).

Eagle was unable to provide the additional resources, Lankford would consult with the operations manager and together they would come to a decision on how to proceed to get the job done on time.  (Lankford Dep. at 108-12).

Lankford spent approximately ten to eleven months per year at tournament job sites.  He spent the remainder of his time working in Double Eagle's warehouse in Birmingham, preparing for his next project and helping load and unload materials.  He did not have an office in the warehouse and did not supervise any warehouse employees.  (Lankford Dec. ¶ 11; Lankford Dep. at 176-79).

Lankford worked for Double Eagle until November 2013, when he was terminated.  (Lankford Dec. ¶1).  Throughout Lankford's entire tenure at Double Eagle, Double Eagle classified him as an exempt employee under the FLSA's administrative and executive exemptions.

### III.   ANALYSIS

The FLSA requires employers to pay covered employees at an overtime rate if they work more than forty hours in a week.  29 U.S.C. § 207(a)(2).  However, employees who are "employed in a bona fide executive, administrative, or professional capacity" are exempt from the overtime pay requirements.  *Id.* § 213(a)(1).  The employer bears the burden of proving that an exemption applies. *Abel v. S. Shuttle Servs., Inc.*, 631 F.3d 1210, 1212 (11th Cir. 2011).  The provisions of the FLSA are interpreted liberally in favor of the employee and its

exemptions are construed narrowly against the employer.  *See Birdwell v. City of Gadsden*, 970 F.2d 802, 805 (11th Cir. 1992).

Here, Lankford contends that he is owed unpaid overtime compensation for the years he worked for Double Eagle.  Double Eagle has moved for summary judgment on Lankford's claims, arguing that he was exempt from overtime pay under the FLSA's administrative and executive exemptions.  The court will address each exemption in turn.

## A.   The Administrative Exemption

The administrative exemption applies to any employee "(1) [c]ompensated on a salary or fee basis at a rate of not less than $455 per week …; (2) [w]hose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and (3) [w]hose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. § 541.200(a).  Lankford concedes that the first prong of the administrative exemption is satisfied; he admits that his salary exceeded $455 per week.  However, he disputes that the second and third prongs are satisfied.

### 1.   Work directly related to management or general business operations

To satisfy the second prong of the administrative exemption, an employee's "primary duty" must be the performance of  office or non-manual work "directly

related to the management or general business operations of the employer or the

employer's customers." 29 C.F.R. § 541.200(a)(2). "Primary duty" is defined as

"the principal, main, major or most important duty that the employee performs …

with the major emphasis on the character of the employee's job as a whole." *Id.* §

541.700(a). Factors to be considered in determining the primary duty of an

employee include, but are not limited to, "the relative importance of the exempt

duties as compared with other types of duties; the amount of time spent performing

exempt work; the employee's relative freedom from direct supervision; and the

relationship between the employee's salary and the wages paid to other employees

for the kind of nonexempt work performed by the employee." *Id.* Although "[t]he

amount of time spent performing exempt work can be a useful guide in

determining whether exempt work is the primary duty of an employee," time

alone "is not the sole test" and there is no requirement that exempt employees

"spend more than 50 percent of their time performing exempt work." *Id.* §

541.700(b).

    To qualify for the administrative exemption, an employee must perform

office or non-manual work "directly related to the management or general business

operations" of the employer or its customers. Such work includes, but is not

limited to,

> work in functional areas such as: tax; finance; accounting; budgeting;
> auditing; insurance; quality control; purchasing; procurement;

13

> advertising; marketing; research; safety and health; personnel
> management; human resources; employee benefits; labor relations;
> public relations; government relations; computer network, internet and
> database administration; legal and regulatory compliance; and similar
> activities.

*Id.* § 541.201(b).  The work must be "directly related to assisting with the running

or servicing of the business, as distinguished, for example, from working on a

production lime or selling a product in a retail or service establishment.  *Id.* §

541.201(a).

Double Eagle asserts that Lankford's primary duty was "*managing* the

construction process for multiple large-scale professional golf tournaments each

year."  (Doc. 24 at 27).  Double Eagle acknowledges that Lankford "spent time

assisting his workforce with the buildout and set up of the golf tournaments," but

argues that "his ultimate responsibility was overseeing and managing that process."

(*Id.* at 28).  Double Eagle contends that Lankford's responsibilities "centered

around non-manual work that directly related to Double Eagle's management or

general business operations," noting that Lankford "managed the performance of

his workers, including requesting specific employees to complete various aspects

of a job; scheduled various stages of the construction and coordinated delivery of

equipment and materials to comport with same; monitored and enforced safety

practices on the jobsite; and, approved invoices and purchase orders."  (*Id.*)

14

Lankford, on the other hand, insists that he was "nothing more than a construction/working foreman who was given a set of plans …, told what materials would be used, told how the project would be designed, had no authority to deviate from the plans, worked alongside of his employees driving forklifts and unloading trucks when need[ed] and basically had no authority to perform any administrative type of duty without first obtaining approval from upper management." (Doc. 29 at 15).  He maintains that he "did not work in an office and the vast majority of [his] work activities consisted of performing manual labor."  (*Id.*)

After carefully reviewing the record, the court concludes that there is a genuine dispute of material fact with respect to whether Lankford's primary duty directly related to the management or general business operations of Double Eagle. In this regard, the court notes again that FLSA exemptions are construed narrowly against the employer and that the employer bears the burden of proving that an exemption applies.  As the party with the burden of proving that the administrative exemption applies, Double Eagle must show that "no reasonable jury" could find for Lankford on this issue.  *Four Parcels*, 941 F.2d at 1438.  Although it is a close call, the court is satisfied that a reasonable jury could find that Lankford's primary duty did not directly relate to the management or general business operations of Double Eagle.

15

The court acknowledges that there certainly is evidence, which Double Eagle has highlighted in its briefs, that Lankford was primarily involved in overseeing and managing the buildout and set up of golf tournaments for Double Eagle's clients.  Indeed, it is undisputed that Lankford was Double Eagle's senior "on-site" representative at each project.  There also is evidence that aspects of Lankford's job included quality control, purchasing, safety and health, and personnel management, work that is directly related to management or general business operations.  *See* 29 C.F.R. § 541.201(b).

On the flip side, there is evidence that Lankford's primary duties were more on the construction/production side of a project than the management/ administrative side.  Although Lankford has offered conflicting estimates of the percentage of his workday he spent performing manual labor, he has consistently maintained that he was more of a "working foreman" than an actual project manager and that he spent a "considerable amount" of his time working alongside the hourly paid employees.  (*See* Doc. 30-1 ¶ 11).  Moreover, regardless of the precise amount of time he was engaged in manual labor, there is no evidence to suggest that Lankford's primary duty was the performance of office work, and it is undisputed that he had little to no involvement in such "business operations" areas as finance, accounting, budgeting, auditing, employee benefits, database administration, and legal and regulatory compliance.  He also had little to no

involvement in the creation of the project plans and could not implement a change, even at the client's request, without upper management approval.

Construing the evidence in the light most favorable to Lankford, a reasonable jury could find that although Lankford was the senior person on site, Double Eagle's upper management retained management and administrative control and that the character of his job was, as he claims, that of a working foreman who worked alongside the crew members in the construction and set up of the tournaments.  A genuine dispute of material fact exists as to whether the work Lankford performed satisfied the second prong of the administrative exemption.

### 2.    Exercise of Discretion and Independent Judgment

Even if the court were to conclude that Lankford satisfied the second prong of the administrative exemption as a matter of law (again, it is a close call), that conclusion would not be dispositive, because Double Eagle has failed to establish the absence of a genuine dispute of material fact as to the third prong – that Lankford's primary duty included "the exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. § 541.200(a)(3). Irrespective of whether Lankford's primary duty was the performance of work directly related to the management or business operations of Double Eagle, there is a genuine dispute of material fact as to whether, in the performance of his work, he

exercised discretion and independent judgment with respect to matters of significance.

The exercise of "discretion and independent judgment" involves "the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a). "Matters of significance" relate to "the level of importance or consequence of the work performed." *Id.* "The ultimate question is whether the employee has the ability 'to make an independent choice, free from immediate direction or supervision.'" *Rock v. Ray Anthony Int'l, LLC*, 380 F. App'x 875, 879 (11th Cir. 2010) (citing 29 C.F.R. § 541.202(c)).

Double Eagle argues that "Lankford's role as a Senior Project Manager required him to (and he did) exercise discretion and independent judgment, as Lankford was the primary point of contact on each jobsite." (Doc. 24 at 29). Double Eagle asserts that "in managing the buildout and set up of each professional golf tournament," Lankford exercised discretion and independent judgment "by necessity." *Id.* As evidence of such exercise of discretion and independent judgment, Double Eagle points to Lankford's decisions regarding "scheduling delivery of materials and equipment, requesting a certain number of employees for a job, requesting specific employees based on their skill set, and assigning employees to specific tasks." *Id.*

Lankford counters that he did not have the authority to exercise any discretion or independent judgment, asserting that he was simply "given Exhibit A and told to go build the project according to the specifications set out in Exhibit A and to use the material and manpower provided to him by the operations department." (Doc. 29 at 17). He notes that he "could not vary from" Exhibit A and could not make any changes desired by the customer "without first obtaining approval from either the account executive or upper management." (*Id.*) He maintains that when constructing the projects "he simply applied and used and followed well-established techniques, procedures or specific standards described in manuals or other sources." (*Id.* at 18).

The court concludes that the evidence presents a genuine dispute as to whether Lankford's primary duty for Double Eagle included the exercise of discretion and independent judgment with respect to matters of significance. Certainly the evidence is not "so one-sided" that Double Eagle must prevail as a matter of law. *Allen*, 121 F.3d at 646. A reasonable jury could find that, as to matters of significance, Lankford did not have the ability to make independent choices free from immediate direction or supervision, but needed upper management approval.

The Eleventh Circuit's decision in *Rock* (which Double Eagle, not Lankford, has cited in its briefs) supports the court's conclusion that this issue should be

decided by the jury.  In *Rock*, the Eleventh Circuit affirmed the district court's determination that a dispatcher exercised discretion and independent judgment in the performance of his job.  The district court found that the dispatcher was responsible for directing and overseeing operators, truck drivers, riggers, oilers, and erection crews; determined which customers' jobs each employee would be assigned and where they would be sent based on their experience and reliability; had supervisory authority to hire and fire employees; and exercised a level of skill that went beyond applying well-established techniques, procedures, or specific standards.  *Rock*, 380 F. App'x at 879.  Based on these findings, the district court determined that the dispatcher exercised discretion and independent judgment for purposes of the third prong of the administrative exemption.  However, the district court made this determination following a bench trial, not at summary judgment. *Id.* at 876; *see Rock v. Sunbelt Cranes, Constr. & Hauling, Inc.*, 678 F. Supp. 2d 1264 (M.D. Fla. 2009).  In affirming the district court's determination, the Eleventh Circuit observed that "[t]o be sure, evidence exists that [the dispatcher's] position did not require the exercise of judgment or discretion," and cited the dispatcher's testimony that "the vast majority of his tasks simply involved the mechanical application of data from load charts"; that he "never resolved customer complaints"; and that he had "little to no role in hiring, firing, promoting, or disciplining employees."  *Rock*, 380 F. App'x at 879-80.  The Eleventh Circuit

20

concluded that "[a]lthough reasonable minds could differ about the degree of discretion [the dispatcher] exercised …, sufficient evidence exists in the record to support the district court's finding that [the dispatcher] exercised discretion and independent judgment." *Id.* at 880.

Here, as in *Rock*, "reasonable minds" could differ about the degree of discretion Lankford exercised in performing his job as Senior Project Manager. Just as in *Rock*, there is evidence supporting the conclusion that Lankford did exercise discretion and independent judgment (such as the evidence that he was Double Eagle's senior "on-site" representative at each project and supervised and assigned the other employees' work), but there also is evidence supporting the opposite conclusion (such as the evidence that he could not deviate from Exhibit A or hire or fire employees without upper management approval). As in *Rock*, this dispute needs to be resolved by the trier of fact, in this case the jury. Therefore, summary judgment is due to be denied as to Double Eagle's defense that Lankford was exempt from overtime under the FLSA's administrative exemption.

**B.      The Executive Exemption**

Double Eagle asserts that Lankford was also exempt from overtime under the FLSA's executive exemption. The executive exemption applies to any employee "(1) compensated on a salary basis at a rate of not less than $455 per week …; (2) [w]hose primary duty is management of the enterprise in which the

employee is employed or of a customarily recognized department or subdivision thereof; (3) [w]ho customarily and regularly directs the work of two or more other employees; and (4) [w]ho has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight." 29 C.F.R. § 541.100.

In his response to Double Eagle's argument that he falls under the executive exemption, Lankford does not address the first prong (salary of not less than $455 per week) or the second prong (primary duty is management of the enterprise) of the exemption.[6]  He does address the third prong (directs the work of two or more other employees), but erroneously asserts that to satisfy this requirement he must "customarily and regularly supervise 2 or more employees for at least 80 hours per week."  (Doc. 29 at 12).  There is no "80 hours per week" requirement; the regulations provide that the phrase "two or more other employees" means "two full-time employees or their equivalent."  29 C.F.R. § 541.104(a).  Nowhere in Lankford's response does he deny that he directed the work of at least two full-time employees, and he admits that he worked between 50 and 85 hours per week

---

[6] However, as discussed previously, in Lankford's response to Double Eagle's administrative exemption arguments he admits that his salary exceeded $455 per week.  He also challenges Double Eagle's contention that his primary duty was the performance of work directly related to the management or business operations of Double Eagle.

depending on the stage of the project.  (Lankford Dec. ¶ 8).  The court is satisfied that Lankford meets the third prong of the executive exemption.

Lankford's primary challenge is to Double Eagle's assertion that he meets the fourth prong of the executive exemption – the requirement that the employee have the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion, or other change in status of other employees are given particular weight.  In its answers to Lankford's interrogatories, Double Eagle denies that Lankford had the authority to "hire, terminate, set pay, award pay increases, and/or promote an individual into any position without first obtaining permission and/or approval from his/her [sic] District/Regional Manager."  (Doc. 29-2, Interrog. 11).  The critical issue, therefore, is whether Lankford made suggestions and recommendations as to the hiring, firing, advancement, and promotion of other employees that were given "particular weight" by Double Eagle's management.

Factors to be considered in determining whether an employee's suggestions and recommendations are given "particular weight" include, but are not limited to, "whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon."  29 C.F.R. §

541.105.  An employee's suggestions and recommendations "may still be deemed to have 'particular weight' even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status."  *Id.*

Here, it is undisputed that Lankford's job description did not include the duty to make suggestions and recommendations regarding the hiring, firing, and promotion of employees, and Lankford has testified that "making recommendations was not part of [his] regular job duties."  (Lankford Dec. ¶ 24).  To the extent Double Eagle contends that making recommendations was part of Lankford's job duties (*see* McMinn Dep. at 54), a genuine dispute of material fact is present.

With respect to the frequency with which Lankford made suggestions and recommendations regarding hiring, firing, and promotion, the evidence is unclear.  Lankford worked for Double Eagle for more than six years (from June 2007 to October 2013).  Lankford testified that in a "couple of cases" Double Eagle hired individuals he recommended for hiring but in "some cases" individuals he recommended were not hired.  (Lankford Dep. at 187).  Lankford also testified that on "one occasion" he was given approval to terminate an employee but on "several others" he was not.  (*Id.* at 185).  He also acknowledged that he could recommend employees for pay raises (Lankford Dep. at 187; Lankford Dec. ¶ 14), but it is

unclear how often he did so. Given that Lankford was employed by Double Eagle for more than six years, the court cannot conclusively determine that the "frequency of suggestions and recommendations" factor is met.  Additional evidence is needed.

Lastly, as to the frequency with which Lankford's suggestions and recommendations were relied upon by management, again the evidence reflects that his recommendations with respect to hiring individuals were followed on "a couple of" occasions and that his recommendations with respect to firing individuals were followed in a single instance but rejected in "several others."   In other words, over the course of six years of employment Lankford's recommendations with respect to terminating employees were rejected by management more often than they were approved, which hardly demonstrates that his recommendations were given any particular weight.

Accordingly, because there are genuine disputes of material fact regarding Lankford's duty (if any) to make suggestions and recommendations with respect to hiring, firing, and promoting employees and whether his suggestions and recommendations were given any particular weight, summary judgment is due to be denied as to Double Eagle's defense that Lankford met the FLSA's executive exemption from overtime requirements.

## IV.   CONCLUSION

For the foregoing reasons, Double Eagle's motion for summary judgment (doc. 23) is due to be denied.  There are genuine disputes of material fact with respect to whether Lankford satisfied all of the requirements of the FLSA's administrative and executive exemptions.  A separate order consistent with this opinion will be entered.

**DONE** this 10th day of March, 2016.

**JOHN E. OTT**
Chief United States Magistrate Judge